# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

TERRENCE LAMONTE RAY,

        Plaintiff,

v.                                  ACTION NO. 2:16cv486

NANCY A. BERRYHILL[1],
Acting Commissioner of Social Security,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Terrance Ray brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 6. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Ray's motion for summary judgment (ECF No. 8) be GRANTED in part and DENIED in part, that the Commissioner's motion for summary judgment (ECF No. 10) be DENIED, and that the Commissioner's decision on Ray's claim be VACATED and REMANDED for further review.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Clerk is directed to substitute Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, for Carolyn W. Colvin, the former Acting Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d).

## I. PROCEDURAL BACKGROUND

Plaintiff, Terrence Ray, protectively filed an application for a period of disability and DIB on January 13, 2015, R. 9, 170–71[2], alleging that he became disabled on October 2, 2008 due to post-traumatic stress disorder ("PTSD"), back and leg problems, nerve damage in his hands and arms, and sleep apnea. R. 67, 79, 220. The Commissioner denied Ray's application on August 12, 2015, and, upon reconsideration, on September 17, 2015. R. 66–77, 78–90, 91–95, 99–101. At Ray's request, an Administrative Law Judge ("ALJ") heard the matter on January 27, 2016, and received testimony from Ray (who was represented by counsel) and an impartial vocational expert ("VE"). R. 23–51, 106–07. During the hearing, Ray agreed to amend the onset date of disability from October 2, 2008 to August 1, 2014. R. 29–30. On March 14, 2016, the ALJ denied Ray's claim, finding that he was not disabled from August 1, 2014 through the date of the decision. R. 9–18.

On June 8, 2016, the Appeals Council denied Ray's request for review of the ALJ's decision. R. 1–5. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481. Having exhausted all administrative remedies, Ray filed a complaint with this Court on August 9, 2016. ECF No. 1. The Commissioner answered on October 14, 2016. ECF No. 4. In response to the Court's order, the parties filed motions for summary judgment, with supporting memoranda, on November 18 and December 19, 2016, respectively. ECF Nos. 8–9, 10–11. Ray also filed a reply to the Commissioner's briefing. ECF No. 12. As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

---

[2] Page citations are to the administrative record previously filed by the Commissioner.

## II. RELEVANT FACTUAL BACKGROUND

*A.*    *Ray's Background and the VA's Disability Rating Decision*

Terrence Ray was born in 1971 and was 43 years old on August 1, 2014, the alleged onset date of disability. R. 170. Ray is a high school graduate and has taken some college courses. R. 27, 221. Ray served for 23 years in the U.S. Army as a cargo specialist, starting at the age of 19 and continuing to July 31, 2014. R. 31, 170. During and after his military service, Ray worked other jobs, which included employment as a parts clerk and mechanic at Pep Boys on a part-time basis from 2010 through July 2014, and as a part-time truck and forklift driver at 84 Lumber from September 2014 through December 12, 2014, when Ray concluded that his conditions prevented him from continuing with such work. R. 30–31, 220–21, 228, 238, 240.

Following Ray's retirement from the Army, on September 27, 2014, the Department of Veterans Affairs ("VA") granted his request for service-connected disability benefits. R. 152–69. The VA rated Ray's disabilities as follows: (a) carpal tunnel syndrome, right upper extremity – 10%; (b) bilateral pes planus with bilateral plantar fasciitis – 10%; (c) left ankle, post open reduction and internal fixation – 10%; (d) sleep apnea – 50%; (e) left shoulder sprain with degenerative joint disease – 20%; (f) left knee, post arthrotomy – 20%; (g) sinusitis – 10%; (h) degenerative joint disease, thoracolumbar spine – 40%; (i) PTSD – 50%; (j) carpal tunnel syndrome, left upper extremity – 10 %; (k) left ankle, post-surgical scar – 10%; (l) seborrhea – 10%; (m) tinnitus – 10%; and (n) right shoulder sprain with degenerative joint disease – 20%.[3]

---

[3] The VA also determined that the following, additional claimed disabilities were "noncompensable:" left and right elbow surgical scars; post-surgical, left and right elbow medial epicondylitis, with residual cubital syndrome; left ankle and knee surgical scars; and shin splints on left and right lower extremities. R. 155, 159–61. Finally, the VA denied service connection for the following, additional claimed disabilities: hypertension; impaired glucose; large intestine neoplasm benign adenoma; pseudofolliculitis barbac; right knee iliotibial band friction syndrome; and left hip joint pain. R. 162–63.

R. 152–63.  After combining the individual ratings, the VA assigned an overall disability rating
of 100% to Ray.  R. 163.

## B.   *Relevant Medical Record*

### 1.   **PTSD and Associated Mental Health Conditions**

On March 21, 2012, Ray received a behavioral health evaluation from a nurse
practitioner at the Naval Medical Center ("NMC") Portsmouth, who diagnosed Ray with an
adjustment disorder and referred him for psychotherapy.  R. 914–18.  A psychiatric exam
revealed Ray to be tired, well-groomed, and cooperative, with an unhappy mood and congruent
affect, and no issues in thought content or processes.  R. 915.  During the evaluation, Ray
reported having anger management concerns, decreased concentration, and difficulties sleeping
due to sleep apnea.  R. 918.  Ray advised that he had been deployed to Kuwait (2002), Iraq
(2004–2005 and 2008–2009), and Afghanistan (2011), and experienced combat stressors,
including mortar and direct fire, improvised explosive devices ("IED"), and a truck accident.  R.
918.  Although the nurse also identified a domestic incident, marital discord (followed by
separation), and an upcoming court date as additional stressors, Ray traced his anger and
irritability issues back to deployments to Iraq.  R. 918.  A PTSD assessment revealed:  (1)
exposure to one or more traumatic combat events involving death and/or the threat of death or
serious injury; (2) constant vigilance and physiologic reactivity to cues, such as loud noises,
associated with prior traumatic events; (3) a restricted range of affect as demonstrated by a lack
of patience and ready susceptibility to agitation; (4) symptoms of increased arousal, including
difficulty sleeping and awakening to minor sounds, irritability and angry outbursts, difficulty in
concentration necessitating greater need for focus to complete tasks, and exaggerated vigilance
and startle responses.  R. 916.  According to Ray, although he used to be fun and outgoing, his

4

"'new short temper'" resulted in problems with and impaired his daily functioning. R. 916. Notwithstanding the symptoms described above, Ray declined medication, but agreed to undergo counselling. R. 918.

On March 27, 2012, Ray began psychotherapy at the McDonald Army Health Center, Behavioral Health Clinic, with a clinical psychologist. R. 902–04. During that session, Ray described himself as angry and lacking patience. R. 903. A mental status exam revealed results similar to those noted on March 21, 2012, but also indicated that Ray's "[a]ttention, concentration, insight, and judgment were good." R. 903. The psychologist diagnosed Ray with an adjustment disorder and developed a therapeutic treatment plan aimed at addressing his irritable mood by improving his coping skills for managing his mood and stressors. R. 904.

To that end, Ray participated in nine therapy sessions with the same clinical psychologist from April 3 through June 4, 2012. R. 822–23, 833–34, 838–39, 847–48, 850–51, 862–63, 872–73, 882–83, 886–87, 903. During these sessions, Ray exhibited moods ranging from "frustrated" to "good," with congruent affect, while addressing issues of anger and frustration stemming from Ray's marital relationship and his Army service. When these sessions apparently failed to yield much progress, due, in part, to Ray's reported failure to "share[] much" information, and Ray expressed ambivalence about continuing, the therapist directed him to consider whether to continue treatment and to "return when . . . ready." R. 822.

Ray did not return to therapy[4] until May 7, 2013, when he received another behavioral health evaluation from a social worker at the McDonald Army Health Center, after calling and requesting help because he felt depressed and angry and contemplated hurting or killing himself

_____

[4] Apparently, due to legal proceedings stemming from a domestic incident between Ray and his spouse, however, Ray attended group family advocacy counselling sessions at NMC Portsmouth from approximately March 2012 through July 2012. R. 779, 780, 793, 803, 815, 827, 853, 869, 874, 925.

or another, and was experiencing sudden mood changes, accompanied by panic and anxiety.  R. 568, 573–79.  The social worker reported a diagnosis of depressive disorder "R/O [rule out] PTSD."  R. 578.  During the evaluation, Ray reported: (1) sleeping three to four hours per night; (2) having marital problems; (3) having "continuous thoughts of hurting others" and having no trust in, or regard for, others or their point of view; (4) having the feeling of being followed by people wanting to hurt him, resulting in him feeling as if "he is always on edge;" (5) the absence of any short-term memory; and (6) that he was angry, quick tempered, and was "afraid of what he might do to someone."  R. 578.  The social worker concluded that Ray presented a moderate suicide risk and characterized him as "'a walking time bomb'" ready to explode.  R. 577.  She recommended individual and group counselling for Ray and referred him to "Emotional Regulation" to gain insight into his anger problems and learn coping skills.  R. 577–79.  The social worker's notes from two ensuing therapy sessions on May 13 and June 6, 2013, continued to identify Ray as a moderate suicide risk, but also noted that he was actively engaged in therapy and reported feeling significantly better at the time of these appointments.  R. 551–53, 562–65.

On July 17 and 18, 2013, Dr. Kirsten Betak, a clinical psychologist and the chief of McDonald Army Health Center, conducted a mental status examination of and a therapy session with Ray, following his request to transfer from his prior clinician.  R. 535, 537.  During these encounters, Dr. Betak found Ray to be well-groomed, alert, without hallucinations or recent memory impairment, tired in appearance, cooperative, having a frustrated mood and congruent affect, but without impairment to his thought content or processes.  R. 536.  Dr. Betak diagnosed Ray with an adjustment disorder with depressed mood linked to a "Phase of Life secondary to transition from military," assessed a low risk of suicide, and directed continued psychotherapy.  R. 538.  From late July through October 2013, Ray attended seven counselling sessions with Dr.

Betak. R. 443, 532. During these treatment sessions, Ray primarily addressed strategies for dealing with common stressors and coping with depression, anger, and PTSD. *See, e.g.,* R. 444–45, 466–67. On September 10, 2013, Ray reported "currently working 50 hours per week in a second job as well as doing custom work on motorcycles on the side." R. 477. On October 9, 2013, Ray reported being in a low mood for several days, remaining angry and frustrated about his experiences in the Army, and stated his belief that the only way to resolve such anger was to harm those who had wronged him. R. 443. During that same session, Ray declined to be medicated and also advised that he "never had a depressive episode so severe he was unable to function at work or socially . . . ." R. 443.

Due to Dr. Betak's apparent absence on extended leave, starting on December 17, 2013 and continuing through July 31, 2014, Ray engaged in therapy sessions with another social worker (Suanne Massey) at McDonald Army Health Center. R. 330, 424, 431. Following up on a prior treatment note and diagnosis by Dr. Betak, the social worker assessed Ray as having a cyclothymic disorder. R. 429, 443. On February 26, 2014, after reporting "increased feelings of depression [and] anger w[ith] increasing difficulty controlling aggression," Ray agreed to seek medication for his condition. R. 409–10. On March 5, 2014, the social worker indicated that Ray reported high levels of general distress and moderate symptoms for depression, anxiety, and PTSD. R. 401.

On March 24, 2014, a nurse practitioner with the McDonald Army Health Center evaluated Ray for medication to treat his condition. R. 382–90. Treatment notes indicate that Ray reported: (1) receiving a "crush" injury to his left leg in June 2012, followed by several reconstructive surgeries; (2) continuing marital discord, following the recent birth of a son; (3) sleep disturbances with nightmares; (4) being withdrawn and easily startled; and (5) experiencing

7

anxiety and severe irritability.  R. 382.  A behavioral health status examination found no indication of suicidal ideation, high reported levels of general distress, significant reported PTSD symptoms, moderate reported symptoms of depression and anxiety, and likely harmful levels of alcohol consumption.  R. 384–89.  After reporting that she would use the current diagnosis of cyclothymia by history and rule out anxiety disorder, the nurse practitioner prescribed Wellbutrin and trazodone to assist with Ray's mood, anxiety, and sleep.  R. 361, 382.  During a follow-up appointment on April 18, 2014, Ray reported "some resolution of depression, irritability, and anxiety" and the nurse practitioner increased the dosage of Wellbutrin "for further therapeutic effect."  R. 361.

During a mid-May 2014 follow-up appointment, the nurse practitioner noted, among other things, that Ray was oriented to time, place, and person, had no hallucinations or recent memory impairment, exhibited normal grooming, had a mildly guarded attitude, presented a dysthymic mood with a blunted affect, and had no impairment of thought processes or content.  R. 351.  The results of her behavioral health status examination were similar to those noted on March 24, 2014, except that Ray reported moderate to high levels of general distress, minor depressive symptoms, moderate PTSD symptoms, and minor anxiety symptoms.  R. 352–55.

Due to his upcoming retirement from the Army, Ray had his last follow-up appointment with the nurse practitioner on June 30, 2014, before the transfer of his care to the VA.  R. 340.  Treatment notes from this visit indicate that Ray reported that "his mood and . . . sleep have been much improved since starting" the medications and that his mood is stable in all aspects of life, other than his marriage.  R. 340 (noting continuing marital discord).  Ray further reported that he continued to have occasional nightmares, mild anxiety, and was easily startled, but that such symptoms were "manageable."  R. 340.  Although he reported difficulty being in crowds and

8

was "slightly suspect of others," Ray also advised he had been participating in social activities with family and close friends.  R. 340.  One month later, during a counselling session with a social worker at McDonald Army Health Center, a behavioral health assessment indicated high levels of general distress, moderate depressive symptoms, severe anxiety symptoms, and moderate PTSD symptoms.  R. 332.

On March 9 and in early April 2015, VA personnel conducted consultation examinations and established an initial mental health treatment plan for Ray.  R. 1600, 1610.  During these visits, Ray reported experiencing PTSD symptoms for two years and depression for six years, and advised that his depression had been exacerbated by periods of unemployment in the last two years, as well as by other physical and emotional stressors, including the aftermath of physical injuries suffered in June 2012.  R. 1600, 1611.  To cope with marital stress and symptoms including depressed mood, anhedonia, hypervigilance, aggression, and isolation, Ray reported that he isolated himself and drank to excess.  R. 1600, 1612.  He also reported having thoughts about harming a former associate, who apparently no longer lived in the same geographic area. R. 1601.  Ray advised that he ran out of Wellbutrin a couple of weeks earlier and that his mood and temper had been "'getting bad again.'"  R. 1611.  He also advised that, aside from family time and fishing, he struggled to find motivation and reported that, "[i]f [he] could get going," he was okay.  R. 1611.  Ray advised that, although his nightmares had lessened, he slept poorly, woke frequently, and was easily disturbed by noise, pain, movement, or anything unusual.  R. 1611.  Ray reported increased forgetfulness and that dealing with family and daily problems resulted in anxiety and stress.  R. 1612.  With respect to PTSD, Ray advised that he remained hypervigilant and sensitive to sudden noises.  R. 1612.  Ray also reported having obsessive-compulsive tendencies, including cleaning and organizing clutter and things perceived as out of

9

order, repeated hand washing (which he cured by working on motorcycles), washing dishes, maintaining a well-manicured lawn[5], and taking two to three showers a day. R. 1612. Although Ray reported marital discord, he reported being close to and involved in the lives of his children from both his current and a prior marriage. R. 1613 (noting that he was helping a 22 year-old daughter "'get her life together'").

A mental status examination conducted by a clinical psychologist on April 1, 2015, found Ray appropriately groomed and oriented, with a euthymic mood and a matter-of-fact affect, coherent and relevant speech, organized and directed thoughts, and unimpaired insight, judgment, and memory. R. 1614. This clinician assessed Ray as having PTSD ("by history with partial remission of [symptoms]") and an adjustment disorder with depressed mood, related to disability and loss of work, and recommended medication management and provision of mental health services by the VA. R. 1611 (depression screening revealed "moderate depression"), 1615.

To that end, on April 1, 2015, a VA psychiatrist, Dr. Victoria Defilippo, also assessed Ray and prescribed a higher dose of Wellbutrin. R. 1225, 1616–17. Dr. Defilippo's treatment notes contain observations similar to those noted above. Additionally, she found Ray to be "very tense and suspicious watching shadows under the door" and exhibited organized thinking, "but with some paranoid ideation" and limited judgment and insight. R. 1617. She reported that Ray "describe[d to her] a very active and structured day [in which] he moves himself to projects and activities to get through the day." R. 1616. Dr. Defilippo diagnosed Ray with depression, mood disorder, PTSD, and a partner relation problem. R. 1619.

---

[5] In August and September 2015, Ray advised SSA officials considering his application that he is able to sit on a riding lawn mower for short periods of time and that "sometimes he might start the lawn but his daughter will finish." R. 60–61, 69.

On May 28, 2015, Ray was seen by a VA staff psychiatrist, Dr. Sonia Aznar, for medication management and reported that the medications prescribed by Dr. Defilippo were helping. R. 1225. At that time, Ray reported that his obsessive-compulsive traits helped him to focus and that he still had anger issues, but declined to attend anger management or psychotherapy. R. 1224–25.

Six weeks later, however, Ray requested mental health services and met with VA treatment team members on July 17, 2015. R. 1220. At that time, while acknowledging that he had made progress with mental health issues, Ray reported continuing depression and hypervigilance and agreed to participate in group counselling. R. 1221. Mental status examination notes from this date indicate, among other things, that Ray was appropriately groomed, well-oriented, engaged, exhibited an anxious mood and congruent affect, spoke coherently, showed organized and goal-directed thinking, and his judgment and insight appeared to be intact. R. 1221.

On September 1, 2015, Ray again saw Dr. Aznar for medication management and psychotherapy. R. 1621. Ray continued to voice complaints pertaining to anger, marital issues, and low grade depression, but reported some ability to restrain his anger and declined to attend anger management. R. 1621. With respect to two other counselling groups ("managing your emotions" and "focus"), Ray advised he was not previously able to attend, but would try to do so in the future. R. 1621. Ray's mental status examination revealed no abnormal findings. R. 1621–22.

A follow-up appointment with Dr. Aznar on November 2, 2015, also revealed no abnormal findings with respect to Ray's mental status. R. 1618. At that time, Ray denied having symptoms of depression, sleep or appetite issues, or medication side effects. R. 1618. Ray,

however, reported frustration at the VA's denial of his application for the caregiver program, as well as with the consequences stemming from his June 2012 injury, including multiple operations and an inability to stand or sit for very long. R. 1618. Finally, Ray also discussed, in detail, his PTSD symptoms, flashbacks, and nightmares. R. 1618. On that date, Dr. Aznar diagnosed Ray with depressive disorder NOS, mood disorder (due to general medical condition and chronic pain), PTSD by history, and a partner relation problem. R. 1619.

### 2.     Back/Degenerative Disc Disease

Following earlier visits in March and May 2012 to NMC Portsmouth during which Ray sought treatment for left hip pain that began one to two years earlier, R. 2233–35, 2240–42, and a physical therapy assessment of left L5 radiculitis, R. 2183–86, on October 12, 2012, Ray's lumbar spine was imaged via an MRI, R. 296–97. The MRI revealed, among other things, that Ray had: (1) disc desiccation and bulging at the L4/L5 level, with mild bilateral apophyseal joint degeneration, resulting in moderate severity, bilateral neural foraminal narrowing (but without evidence of spinal canal stenosis); and (2) disc desiccation and bulging at the L5/S1 level, along with bilateral apophyseal joint degeneration, resulting in severe, bilateral neural foraminal narrowing and "likely a degree of compression of existing nerve roots." R. 297.

After reportedly obtaining minimal relief with conservative treatment modalities, including physical therapy, *see, e.g.,* R. 2062–63, following a December 20, 2012 appointment at the Pain Management Clinic at NMC Portsmouth, Ray was scheduled for steroid injections. R. 1989–91 (reporting "8 year history of low back pain which has been increasing in severity over the last year [and] radiates into [the] left lateral thigh"). Ray received the first caudal epidural steroid injection on January 28, 2013, R. 1960–61, and the second on April 22, 2013, R. 1928–29. Following the first injection, Ray reported several weeks of improvement in his back pain

12

and subsequent examination revealed some "decreased sensation to light touch" in the left lateral thigh.  R. 1929.

On August 14 and September 18, 2013, Ray was examined at NMC Portsmouth's Orthopedic Spine Clinic and was diagnosed with intervertebral disc degeneration – lumbar, and was referred for physical therapy.  R. 1807–11, 1845–47.  During the latter visit, Ray reported having chronic, left, lower back pain that radiated to his left knee, that was present upon awakening and worsened with sitting, driving, standing, and bending, and was relieved only by lying down and frequently changing position.  R. 1809.

On October 23, 2015, Ray also sought emergency treatment at the Hampton VA Medical Center for a recent flare up of atraumatic, lower back pain (at level 8 out of 10).  R. 1602–07.  After evaluation revealed spinal tenderness but intact motor strength and sensation, and no evidence of herniation, Ray was prescribed Vicodin, Indocin, and Baclofen and released.  R. 1607.

### 3.    Hand, Arm, and Shoulder Conditions

The administrative record reflects that Ray has an extensive history of treatment for hand, arm, and shoulder issues.  This history dates back to 2007 and 2008, when Ray underwent carpal and/or cubital tunnel surgery on both wrists.  R. 309, 1032, 1083, 1207.  Notwithstanding these procedures, Ray later sought treatment and/or medication for numbness, pain, or swelling in his hands, arms, elbows, and shoulders:  (1) in 2010, R. 303–05, 1023–24, 1031–33, 1204–07; (2) in 2011, R. 961–63, 969–70, 1188–90 (noting March 17, 2011 surgery, with ulnar nerve transposition, for right cubital tunnel syndrome), 1191–93 (noting January 11, 2011 surgery, with ulnar nerve transposition for left cubital tunnel syndrome); (3) in 2012, R. 934–35 (noting post-surgical elbow joint pain); (4) in 2013, R. 421 (diagnosing carpal tunnel syndrome and releasing

13

without limitations on December 19, 2013, notwithstanding continued wrist and elbow pain), 435–38 (seeking medication refill for elbow and wrist pain after having completed physical therapy), 1104–06; and (5) in 2015, R. 289–90, 308–14, 1626–28.

The most recent treatment record reflects that, on July 8, 2015, Ray reported to NMC Portsmouth and stated that, after a fall in June 2015, he continued to have pain in both wrists, along with intermittent swelling. R. 308. Ray denied having numbness or tingling. R. 308. Wrist x-rays revealed no fractures, no bone displacement, no evident soft tissue swelling, no acute osseous abnormalities, or other significant degenerative changes. R. 289–90. A physical examination of both wrists revealed Ray had abnormal motion, but normal stability and motor strength, with no sign of tenderness upon palpitation or swelling. R. 310. As treatment, Ray was supplied with wrist splints and directed to continue taking Ibuprofen. R. 312.

### 4. Ankle Condition

While Ray drove a forklift on June 15, 2012, a jersey barrier fell onto his left leg and fractured his ankle in multiple locations. R. 43, 800. After being transferred to NMC Portsmouth, on June 26, 2012, Ray underwent a surgical open reduction and internal fixation of a bimalleolar left ankle fracture. R. 800, 1153–59. Due to continuing pain and left ankle dysfunction, on February 7, 2013, Ray received a CT scan that revealed post-traumatic ossicles at the posterior malleolus and an anterior calcaneal process. R. 1948–50. The CT also revealed degenerative spurring in the left ankle, as well as an intra-articular body located at the anterior tibiotalar joint and an osteochondral injury at the medial talar dome. R. 1950–51. As a result, on June 6, 2013, Ray required additional surgery comprised of a left ankle arthroscopy with microfracture and debridement. R. 1127–30. Following the surgery, Ray was advised to put no weight on his ankle for six weeks. R. 1129–30.

Following a course of physical therapy, *see, e.g.,* R. 1869–71, and due to Ray's reported continuing ankle pain on walking and inability to engage in everyday activities, R. 1099, 1754, Ray underwent a third, left ankle surgery on March 11, 2014 to address what had been diagnosed as tarsal tunnel syndrome, posterior tibial tendon tenosynovitis, and symptomatic hardware. R. 1098. The surgeon's notes reflect an open reduction and internal fixation procedure, with a left tarsal tunnel release, debridement of the left posterior tibial tendon sheath, and removal of two of the screws previously installed in the left ankle. R. 1098–1100[6]. When next seen on March 24, 2014, Ray advised the surgeon that he felt much better after the surgery, had regained sensation in his ankle, and had been "ambulating in [the walking] boot." R. 1726.

Following the transfer of Ray's care to the VA, during a March 9, 2015 primary care screening that revealed no ankle edema and listed Ray's weight at 263 pounds, he received a prescription refill of Meloxicam following his report of constant pain (at level 4 out of 10) in his left leg and ankle. R. 1244–45, 1248–50. During a visit with a primary care provider on September 1, 2015, Ray also reported having chronic and continuing pain stemming from the forklift accident noted above. R. 1626–28.

### 5.  Sleep Apnea

Ray's medical records from the Army contain regular entries reflecting treatment for obstructive sleep apnea and his use of a CPAP machine. *See, e.g.,* R. 1271, 1511, 2277–78, 2284. Records from the VA dated June 11, 2015, during a CPAP equipment and pressure check, reflect a diagnosis of obstructive sleep apnea and Ray's use of a CPAP machine on 178 out of 365 days. R. 1608.

---

[6] The operative report mistakenly refers to the right ankle. R. 1098–1100. The record reflects, however, that Ray previously had hardware installed in the left ankle, following the June 2012 accident. R. 1153–59.

15

C.    *Medical Opinions and Residual Functional Capacity Assessments*

On August 12, 2015, Julie Jennings, Ph.D., a state agency psychological consultant, reviewed Ray's case utilizing the psychiatric review technique and conducted a mental residual functional capacity assessment.  R. 70–75.  Dr. Jennings opined that Ray had no limitations regarding memory and understanding or with sustained concentration and persistence (finding only mild difficulties in maintaining concentration, persistence, and pace).  R. 71.  With respect to social interactions, Dr. Jennings determined that Ray was:  (1) moderately limited in interacting with the general public, in accepting instructions and responding to a supervisor's criticism, and in getting along with peers and co-workers.  R. 74.  She found no significant limitation in Ray's ability to ask questions, seek help, and maintain socially appropriate behavior and standards.  R. 74.  Accordingly, Dr. Jennings advised that Ray could perform "simple, unskilled, non[-]stressful work with some social limitations due to residual symptoms of PTSD and depression."  R. 75.

On reconsideration on September 16, 2015, David Deaver, Ph.D., another state agency psychological consultant, also reviewed Ray's case utilizing the psychiatric review technique, determined that Ray's anxiety and affective disorders were non-severe, and, without further elaboration, characterized as "mild" Ray's restrictions and difficulties in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace.  R. 84.

D.    *Testimony before the ALJ*

1.    **Terrence Ray**

At the January 27, 2016 hearing before the ALJ, Ray testified about the effects of PTSD, arm/shoulder/hand problems, back/leg problems, and ankle swelling on his functioning and daily

life.[7]  Due to his mood swings, Ray reported that his wife found herself unable to live with him and now resides in Germany with his youngest son, leaving Ray to live in Newport News with his 21-year old daughter from a prior marriage.  R. 27, 39.  Ray testified that his daughter plays a significant role in his life by doing, among other things, household and other chores, grocery shopping, and assisting with his care, for example, by helping him put shirts on when he is unable to lift his hands over his head.  R. 28, 32–33.  He advised his other sons help out by cutting the grass and getting his car washed.  R. 32.  After retiring from the Army in July 2014, Ray reported working for four to five months as a truck and forklift driver at 84 Lumber, until such time as arm difficulties prevented him from pulling himself into and out of work vehicles. R. 30–31.

Ray indicated that during his Army deployments abroad he saw hand-to-hand combat.  R. 40.  Ray advised that PTSD has resulted in family strife and manifests itself in his mood swings, aggression, sensitivity and vigilance when driving or socializing with others, and worry about being followed by others seeking to shoot or blow him up.  R. 35–39.  Although Ray drives occasionally (one to two times per week) to medical appointments, haircuts, and sometimes goes grocery shopping with his daughter, he limits his driving due to PTSD.  R. 28, 35–37 (noting change in personality upon encountering "triggers" while driving and that both his wife and daughter expressed concern about his driving demeanor).  Ray reported that taking Wellbutrin and Trazodone helps his PTSD, but also reported recently re-enrolling in PTSD group therapy due to rising aggression and because it "help[s] to be around other people that are just like [him] . . . ."  R. 32, 39.  Ray denied participating in other clubs, support groups, or religious organizations.  R. 32.

---

[7] To treat these conditions, on January 22, 2016, Ray completed a medication sheet indicating that he was then taking Trazadone (for sleep), Wellbutrin (for anger and depression), Gabapentin (for chronic pain), Baclofen (for back spasms), and Bupropion (for depression).  R. 2289–90.

17

Ray described a typical day as follows. He reported waking at 5:00 or 5:30 a.m. and going to bed at 9:00 or 9:30 p.m. R. 32, 34. After brushing his teeth, he typically watches television, feeds and lets the dog out, "maybe" dusts around the house "or something," reads the Bible, sometimes goes grocery shopping (while riding in a mobile cart) with his daughter, plays Xbox, and occasionally socializes with others by watching football. R. 32–33. When able to stand for longer time periods, Ray advises that he cooks dinner and does so by taking breaks and by cooking meals that do not require constant attention. R. 34.

Noting an apparent discrepancy between Ray's testimony and his reported activities of daily living noted in Exhibit 7F[8], which the ALJ indicated "talks about how busy you are, that you have a very structured life," the ALJ asked Ray to address the discrepancy. R. 34. In response, Ray described himself as obsessive-compulsive because, whether dishes need to be washed or floors swept, he will perform such tasks because he "like[s] everything done a certain way." R. 34. Ray also answered that his activity is more limited now, due to his health condition and the fact that he has to wait longer to be treated by the VA. R. 34–35 (noting a recent arm injury and stating that "I'm walking around with all these deficiencies, but they're not getting fixed and they're getting worse").

---

[8] As noted above, on April 1, 2015, Ray was separately examined at the VA by a clinical psychologist and a psychiatrist. R. 1610–1618. With respect to daily activities, the psychologist noted that Ray reported struggling with loss of motivation and found it hard to start the day, but noted that family time and fishing provided him with motivation. R. 1611. Ray reported using "military routines to structure his day." R. 1611. Ray reported having stress and anxiety in managing "'ordinary things'" and day-to-day problems and said he exhibited obsessive-compulsive tendencies in cleaning up, showering, washing dishes and his hands, and maintaining his lawn. R. 1612. He also reported working on motorcycles. R. 1612. In speaking to the psychiatrist, Ray also referred to engaging in unnecessary and compulsive cleaning, and indicated it helped him to be "aware." R. 1616. The psychiatrist noted that Ray described to her "a very active and structured day . . . during which [he] moves himself to projects and activities to get through the day." R. 1616 (noting that "[a]s long as I'm busy I'm good").

With respect to his back and leg, Ray reported that he is unable to sit for long, because a band on his left hip gets numb and it "feel[s] like somebody's pulling skin off me . . . ." R. 29, 34 (requesting permission to stand during his testimony).  Ray also reported continuing to have regular swelling stemming from the break and surgical repair of his left ankle, which he elevates throughout the day to relieve swelling. R. 43–44.

With respect to his hands and arms, Ray testified that "[r]ight now" he was unable to carry anything in his left hand and felt as if he was having "muscle failure" in his left elbow. R. 40–41.  Ray testified that he compensates by using his right hand, which he described as "not as bad" and able to lift five to seven pounds. R. 41–42.  With respect to fine manipulation of the hands needed for tasks such as typing or handwriting, Ray said that he could engage in such tasks for about five or ten minutes, after which his wrist and elbow problems require him to stop and rest, along with standing and moving about. R. 41–42.  He reported that the surgeries on his arms helped some, but that he still encounters a loss of "feeling in the last three fingers" and that the feeling he does have is "not really that good." R. 42.  He further indicated that he recently had an MRI on his left elbow and shoulder. R. 42.

When asked by the ALJ whether he had a problem with alcohol, Ray denied the same and stated that, previously, he was headed for a problem when he drank heavily following multiple deployments. R. 45–46.  Ray further stated that, with the benefit of counselling, he realized that alcohol did nothing to help his anger and PTSD, so he stopped drinking for 18 months and now only drinks lesser amounts when watching Sunday football games. R. 46.

## 2.   Vocational Examiner – Linda Augins

Linda Augins, a vocational expert ("VE"), responded to the ALJ's hypothetical questions concerning the availability of jobs for a 44 year old, with a high school education, and a past

work experience corresponding to Ray's.  R. 47.  In the first hypothetical, the ALJ limited the hypothetical subject to:  (a) light exertion; (b) having a need, on an hourly basis, to alternate between sitting and standing while maintaining himself at a workstation; (c) only occasional bending, stooping, or crouching; (d) frequent, but not constant grasping and fingering; (e) the performance of routine/repetitive tasks; and (f) avoiding occupations involving direct interaction with the general public.  R. 47–48.  Jobs in the national economy existed for such a hypothetical person, according to the VE, as a machine operator, garment sorter, or mail sorter.  R. 48.

In the second hypothetical, the ALJ directed the VE to assume the same limitations as those just discussed, with the added limitation that the hypothetical individual was restricted to sedentary exertion.  R. 48.  Again, the VE testified that such a person could find work as a surveillance system monitor or a telephone information clerk.  R. 48.

Next, the ALJ asked the VE to use the same limitations as in the second hypothetical and to further limit the hypothetical individual to "only occasional grasping or fingering."  R. 48–49.  In response, the VE testified that all light jobs would be precluded, but said person could still find work in the national economy as a surveillance system monitor or telephone information clerk, except that the number of jobs available for the latter position would "probably" be reduced by 20 - 30%.  R. 49.

Finally, the ALJ asked the VE to use the same limitations as in the third hypothetical, with an added limitation requiring frequent, unscheduled breaks such that the hypothetical person would be off task more than 15% of the time.  R. 49.  The VE testified that there would not be any jobs in the national economy for such a person.  R. 49.

In response to the ALJ's inquiry whether any significant differences existed between the "way [she] used those jobs and the way they're defined in the *Dictionary of Occupational Titles*

["DOT"]," the VE testified that a difference existed for the job of surveillance system operator. R. 49. She stated that, notwithstanding the DOT's indication that such a job exists only in public transportation terminals, it also exists in retail establishments. R. 49.

In response to questions from claimant's counsel, the VE agreed that, if the hypothetical person needed to "completely" avoid direct interactions with the general public, such would preclude employment as a telephone information clerk. R. 50. She further agreed that work as a surveillance system monitor required vigilance and "very acute concentration abilities" and that, if the hypothetical person "was off task more than prescribed tolerances," such work was also precluded. R. 50. Finally, she indicated that, if the hypothetical person needed to elevate his left leg an entire work day due to swelling concerns, such would also preclude the work she described. R. 50.

### III. THE ALJ's DECISION

To evaluate Ray's claim of disability[9], the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a). Specifically, the ALJ considered whether Ray: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents him from performing any past relevant work in light of his residual

---

[9] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *accord* 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

functional capacity; and (5) had an impairment that prevents him from engaging in any substantial gainful employment. R. 11–18.

The ALJ found that Ray met the insured requirements[10] of the Social Security Act through December 31, 2019, and he had not engaged in substantial gainful activity since August 1, 2014, his alleged onset date of disability. R. 11.

At steps two and three, the ALJ found that Ray's PTSD, carpal tunnel syndrome, ankle injuries, obesity, and degenerative disc disease constituted severe impairments. R. 11. The ALJ classified Ray's other asserted impairments as non-severe, because they either responded to medication or required no significant medical treatment or did not continuously exist for a 12-month period or otherwise continuously impose functional limitations upon Ray. R. 12. The ALJ further determined that Ray's severe impairments, either singly or in combination (along with his other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 12–13 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).

The ALJ next found that Ray possessed a residual functional capacity ("RFC") to perform light work, *see* 20 C.F.R. § 404.1567(b), subject to the limitations:  (a) that he "be allowed to alternate sitting and standing after one hour; [(b)] he can perform only occasional bending, stooping, and crouching; [(c)] he is limited to frequent grasping and fingering; and [(d)] he is limited to routine, repetitive tasks with no direct interaction with the general public." R. 13. Based upon this assessment of Ray's RFC, the ALJ determined at step four that Ray could not return to his past relevant work as a truck driver/forklift operator, cargo specialist, or parts clerk. R. 17.

---

[10] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

Finally, at step five, and after considering his age, high school education, work experience, and RFC, the ALJ found that Ray could perform other jobs, such as a machine operator, garment sorter, and mail sorter, which existed in significant numbers in the national economy. R. 17–18. Accordingly, the ALJ concluded that Ray was not disabled from August 1, 2014 through the date of the ALJ's decision and was ineligible for a period of disability or DIB benefits. R. 18.

## IV. <u>STANDARD OF REVIEW</u>

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." *Craig*, 76 F.3d at 589 (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to

any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## V. ANALYSIS

*A.  The ALJ erred in failing to adequately explain why Ray's moderate mental limitations did not affect Ray's capacity to work on a regular basis and in presenting an incomplete hypothetical to the vocational expert.*

Relying on the Fourth Circuit's decision in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), Ray argues that the ALJ erred in failing to reconcile the apparent contradiction in his findings that Ray suffers from moderate deficits in the ability to concentrate, persist, and keep pace at work, yet could perform unskilled, routine, and repetitive tasks throughout a work week. Pl. Mem. in Supp. of Summ. J. ("Pl. Mem."), ECF No. 9 at 20–21.  Ray claims that the ALJ, while limiting Ray to simple kinds of tasks, without direct public interaction, neglected to differentiate between the ability to engage in such tasks and the need for their *continuous* performance during any given work day or week. *Id.* at 21.  For this reason, Ray argues that remand is required as the ALJ's decision is not supported by substantial evidence.

In response, the Commissioner argues that remand is neither necessary nor required because the ALJ explained why Ray's moderate concentration, persistence, and pace limitations would not prevent him from performing the work tasks in the setting specified by the ALJ. Def.'s Mem. in Supp. of Summ. J. and in Opp. to Pl.'s Mot. for Summ. J. ("Def. Mem."), ECF No. 11 at 12.  According to the Commissioner, the ALJ's discussion about Ray's activities of

daily living, his history of favorable mental status examinations, and his ability to understand and respond to questions at the hearing, satisfied *Mascio* and demonstrated why the ALJ adequately accounted for Ray's deficits, without specifying further RFC limitations. *Id.* at 12–14. Having considered the arguments presented by the parties, the Court finds that the ALJ failed to satisfy the requirements of *Mascio* for the reasons set forth below.

As part of the five-step sequential analysis, an ALJ must determine a claimant's residual functional capacity, or RFC. *See* 20 C.F.R. § 404.1545. The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting . . . 8 hours a day, for 5 days a week." Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis in original). An ALJ must assess a claimant's work-related abilities on a function-by-function basis. *Id.* at *3 (assessing physical, mental, and other abilities to perform work requirements in light of limitations and impairments). After doing so, the ALJ may express the RFC in terms of both the exertional levels of work (sedentary, light, medium, heavy, and very heavy) and the nonexertional functions supported by the evidence. *Id.* In determining a claimant's RFC, the ALJ must consider all relevant medical and other evidence in the record. 20 C.F.R. § 404.1545(a)(3).[11] The ALJ then uses the RFC to determine whether the claimant can perform his past relevant work (step four), and whether the claimant can adjust to any other work that exists in the national economy (step five). *Id.* at § 404.1545(a)(5).

Approximately one year before the ALJ's decision in this case, the Fourth Circuit clarified the requirements of SSR 96-8p, holding that an ALJ *fails* to account for a claimant's moderate limitations in concentration, persistence, or pace by limiting the RFC to simple or

---

[11] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

routine tasks, or unskilled work. *Mascio*, 780 F.3d at 638. *See also Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180–81 (11th Cir. 2011); *Stewart v. Astrue*, 561 F.3d 679, 684–85 (7th Cir. 2009) (*per curiam*); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004); *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996). The Fourth Circuit observed that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Mascio*, 780 F.3d at 638.

Although not adopting a *per se* rule requiring remand whenever an ALJ's RFC determination fails to address the ability to stay on task, *Mascio* requires sufficient analysis for a court to meaningfully review the ALJ's conclusions. *Id.* at 636–37 ("Here, the ALJ has determined what functions he believes Mascio can perform, but his opinion is sorely lacking in the analysis needed for us to review meaningfully those conclusions. In particular, although the ALJ concluded that Mascio can perform certain functions, he said nothing about Mascio's ability to perform them for a full workday."). In this regard, the Fourth Circuit indicated that, if an ALJ explained why moderate deficits in the ability to concentrate, persist, and keep pace did not necessitate additional limitations in a claimant's RFC, remand may not be required if the explanation adequately addresses why such deficits do not affect a claimant's ability to work. *Id.* at 638; *see also Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (noting that the explanation must supply a "logical bridge" sufficient to disclose how the seemingly contradictory findings were reconciled).

In this case, the ALJ determined that Ray possesses an "[RFC] to perform light work . . . [,] except he must be allowed to alternate sitting and standing after one hour; he can perform only occasional bending, stooping, and crouching; he is limited to frequent grasping and fingering; and he is limited to routine, repetitive tasks with no direct interaction with the public."

26

R. 13. In reaching this conclusion, the ALJ gave little weight to the opinions of non-examining, state agency physicians and psychological consultants who determined, among other things, that Ray could work at a medium exertional level and found only mild limitations with respect to concentration, persistence, and pace. R. 17. Instead, the ALJ ruled that Ray's exertional level was more limited and that "new evidence and testimony reflect that his mental impairments are medically severe and function[] limiting . . . ." R. 17. However, the ALJ's RFC determination did not address, as *Mascio* requires, Ray's ability to stay on task during the course of a work day and work week. Moreover, the ALJ declined to use the limitation contained in the only hypothetical he presented to the VE addressing that factor. R. 49 (VE testifying that no jobs existed in the national economy for the hypothetical person specified by the ALJ who would be off task for more than 15% of the time).

Nevertheless, in assessing whether Ray met the requirements of a listed impairment at step three and while addressing the "paragraph B" criteria, the ALJ discussed Ray's ability to concentrate, persist, and keep pace. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) (discussing "paragraph A" and "paragraph B" criteria for mental impairments and the use of the latter in assessing how a mental disorder impacts function in a work setting); 20 C.F.R. § 404.1520a (discussing use of "special technique" to rate the extent of a claimant's limitation in certain areas of function as none, mild, moderate, marked, or extreme). In the area of concentration, persistence, and pace, the ALJ found that Ray had "moderate difficulties due to mood disturbance and the effects of chronic pain."[12] R. 13. Notwithstanding these difficulties,

---

[12] At step two, the ALJ found that Ray's impairments and symptoms "*limit the claimant's physical and mental abilities to do basic work activities, such as* sitting, walking, lifting, carrying pushing, pulling, reaching, engaging in postural activities; *understanding, carrying out, and remembering simple instructions; responding appropriately to supervision, co-workers and unusual work situations; and dealing with changes in the routine work setting.*" R. 12 (emphasis added).

the ALJ noted that Ray retains "the ability to sustain focus, attention, and concentration sufficiently long enough to permit the timely and appropriate completion of simple routine tasks, as reflected in his extensive daily activities."[13] R. 13. Further, the ALJ noted that, during the hearing, Ray "did not . . . manifest any difficulties concentrating[ . . .], appeared to process questions with little difficulty[,] and . . . respond[ed] . . . appropriately and without delay." R. 13. Finally, the ALJ noted that repeated mental status examinations found Ray to be "alert and . . . [with] intact thought processes, thought content and memory." R. 13.

Although, as acknowledged by the ALJ, the rating of the severity of mental impairments at steps two and three is somewhat distinct from the more detailed process of assessing RFC at step four, R. 13, the Commissioner contends that the discussion above suffices to explain why, notwithstanding Ray's deficits in concentration, persistence, and pace, the ALJ declined to incorporate additional limitations into his RFC. Def. Mem. at 12–14. The Court disagrees. The question is whether substantial evidence supports the ALJ's determination that, notwithstanding Ray's deficits and limitations, he is able to regularly and continuously work eight hours a day, five days a week. SSR 96–8p, 1996 WL 374184, at *2. That Ray engages in activities such as dressing, grooming himself, washing dishes, occasional driving, occasional shopping, hobbies, and the like, and attempts to impose some kind of structure and routine to his days, does not address whether he could sustain work activities and stay on task throughout full-time work weeks. *See, e.g., Watson v. Colvin*, No. 2:15cv407, 2016 WL 4154920, at *5 (E.D. Va. Aug. 3, 2016) (noting that claimaint's "abilities to drive and to manage her daughter's medical equipment do not address her potential to remain on task throughout the day"); *Baez v. Colvin*, No. 2:14cv628, 2015 WL 9652888, at *19 (E.D. Va. Dec. 7, 2015) (noting that ALJ's

[13] With respect to these activities of daily living, the ALJ found Ray only mildly restricted based upon his relative independence and his ability to dress and groom himself, prepare meals, travel, go shopping, manage his finances, and do chores and laundry. R. 12.

"conclusion that [claimant] could 'sustain simple work tasks' because of his ability to perform limited duty and go to church still does not explain how [claimant]'s moderate limitations in concentration, persistence, and pace affect his ability to stay on task for an entire work day"), *report and recommendation adopted*, 2016 WL 69900 (E.D. Va. Jan. 5, 2016). In the absence of any analysis of how much time Ray spends, in any given day or week, on the aforementioned activities of daily living and any comparison of such hours to those required in an ordinary work week, Ray's performance of certain basic, daily living tasks tends only to support the ALJ's conclusion that he is able to perform "routine, repetitive tasks." R. 13.

Similar analysis applies with respect to Ray's testimony before the ALJ and the results of his mental status examinations. That Ray possessed sufficient concentration and understanding to briefly testify before the ALJ fails to shed much light on his ability to work a 40-hour week, particularly in light of the ALJ's findings concerning Ray's medically severe and function limiting mental impairments and chronic pain. R. 13, 17. Also, most of the favorable mental status examinations noted in the record occurred during psychotherapy appointments premised, in substantial part, upon diagnoses of the very mental impairments (including PTSD) that the ALJ deemed to be severe and limiting. In the absence of discussion about how Ray's memory and thinking performance relates or translates into an ability to maintain concentration and sustain continuous work, the mental status notes appear to be more relevant to determining the types of tasks Ray may perform, rather than how long he can perform them.

For these reasons, and because the ALJ failed to logically bridge and "'connect the dots'" between his determination of Ray's impairments and the RFC, *see Young*, 362 F.3d at 1002–03, his decision is not supported by substantial evidence that a reasonable mind would deem adequate to support the conclusion reached. Similarly, the ALJ also erroneously decided that

29

Ray could perform other work existing in the national economy, by relying upon the VE's answer to a hypothetical question that failed to incorporate Ray's moderate difficulties with concentration, persistence, and pace. *Mascio*, 780 F.3d at 638 (noting that a hypothetical question to the VE would be incomplete if it was based upon an RFC that "failed to account for a relevant factor"). On remand, the ALJ needs to more robustly explain whether and how Ray could perform light work in spite of any existing mental limitations, as well as ensure that the hypothetical question posed to the VE is based upon a complete assessment of Ray's RFC.

**B.** ***Due to the absence of an apparent conflict between the VE's testimony and the ALJ had no obligation to inquire whether a person with a sit/stand option could perform the jobs identified.***

Ray also argues that the ALJ erred in failing to identify, seek an explanation for, and analyze an apparent conflict between the VE's testimony about the jobs that could be performed by the individual presented in the ALJ's first hypothetical and the requirements of those jobs as defined in the Dictionary of Occupational Titles ("DOT").[14] Pl. Mem. at 21–24. These errors, Ray argues, precluded the ALJ from issuing a "not disabled" ruling premised upon the VE's testimony. In response, the Commissioner argues that Ray improperly bases his claim of error upon evidence not presented to the ALJ and not part of the record and that the ALJ, by expressly asking for and receiving a reasonable explanation from the VE for the only identified discrepancy between the jobs identified and the DOT, thereafter properly relied upon the VE's testimony. Def. Mem. at 14–16.

---

[14] The *Dictionary of Occupational Titles*, and its companion, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (hereinafter "DOT"), are resources used by the SSA that review occupations present in the national economy and discuss physical and mental requirements pertaining to those occupations. U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. 1991); U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993).

The ALJ determined that Ray possessed the RFC to perform light work[15], but noted that his "ability to perform all or substantially all of the requirements of [light] work has been impeded by additional limitations." R. 18. To reflect this, the ALJ's hypothetical to the VE presented a person of the claimant's age, education, and past work experience, with the RFC noted above. R. 13, 47. In response, the VE testified that the hypothetical individual could perform the unskilled, light jobs of machine operator, garment sorter, and mail sorter that existed in significant numbers in the national economy. R. 48. After asking additional hypotheticals, the ALJ asked the VE about whether discrepancies existed between any of the jobs she identified and the DOT, and, with respect to the three jobs noted above, the VE identified none. R. 49. Finally, in his decision, the ALJ ruled that, pursuant to Social Security Ruling 00-4p, 2000 WL 1898704 (Dec. 4, 2000), he also determined that the VE's testimony was consistent with the information in the DOT. R. 18.

Recently, in *Pearson v. Colvin*, 810 F.3d 204 (4th Cir. 2015), the Fourth Circuit reviewed SSR 00-4p and the obligations it imposes upon an ALJ. The Fourth Circuit ruled that SSR 00-4p requires an ALJ: (1) to inquire of a VE whether the VE's testimony conflicts with job information contained in the DOT; (2) to also independently identify whether any apparent conflicts exist between the evidence supplied by the VE and the DOT; (3) to seek, with respect to

---

[15] "Light" work is work that:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

any apparent conflicts identified, an explanation from the VE for any such conflict; and (4) to address whether the VE's "explanation is reasonable and provides a basis for relying on the [VE's] testimony rather than the [DOT]." *Pearson*, 810 F.3d at 208–11.

In this case, it is undisputed that the ALJ satisfied the first of the responsibilities discussed in *Pearson* and set forth in SSR 00-4p. Notwithstanding the ALJ's statement that he also determined that the VE's testimony was consistent with the DOT, R. 18, Ray contends that the ALJ actually failed to satisfy *Pearson* and SSR 00-4p's second, third, and fourth requirements to independently identify and attempt to reconcile other "apparent" conflicts between the VE's testimony and the DOT. *Pearson*, 810 F.3d at 209 ("SSR 00-4p makes plain . . . that the ALJ must identify where the expert's testimony seems to, but does not necessarily, conflict with the [DOT].").

The DOT describes the three jobs identified by the VE, and discussed in the ALJ's ruling, as follows.

> 786.685-018 EMBROIDERY-MACHINE OPERATOR (garment)
>
> Tends semiautomatic sewing machine with multiple-sewing heads controlled by pattern chain that embroiders designs on garments or garment parts: Positions garment or part over embroidery hoops arranged in hoop frame, following edges or markings on fabric. Places hoop frame on machine bed and turns thumbscrews to secure frame to machine. Presses button to start machine that sews design onto garment or part and stops, or sews one color of multiple-color design and stops. When sewing multiple-color designs, rethreads machine with subsequent colors of thread and starts machine to complete design. Removes hoop frame from machine on completion of design and removes garment or part from hoops.

U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. 1991), 1991 WL 681080.

222.687-014 GARMENT SORTER

Sorts finished garments, such as shirts, dresses, and pajamas, according to lot and size numbers recorded on tags and labels attached to garments. May fold and package garments in boxes and bags. May iron garments prior to folding [PRESSER, HAND (any industry)]. May be designated according to garment sorted as Shirt Sorter (garment).

U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. 1991), 1991 WL 672131.

209.687-026 MAIL CLERK

Sorts incoming mail for distribution and dispatches outgoing mail: Opens envelopes by hand or machine. Stamps date and time of receipt on incoming mail. Sorts mail according to destination and type, such as returned letters, adjustments, bills, orders, and payments. Readdresses undeliverable mail bearing incomplete or incorrect address. Examines outgoing mail for appearance and seals envelopes by hand or machine. Stamps outgoing mail by hand or with postage meter. May fold letters or circulars and insert in envelopes [FOLDING-MACHINE OPERATOR (clerical) 208.685-014]. May distribute and collect mail. May weigh mail to determine that postage is correct. May keep record of registered mail. May address mail, using addressing machine [ADDRESSING-MACHINE OPERATOR (clerical) 208.582-010]. May be designated according to type of mail handled as Mail Clerk, Bills (clerical).

U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. 1991), 1991 WL 671813.

Based upon three YouTube videos cited in his brief, but neither offered into evidence nor otherwise made a part of the record, Ray contends that each of these three jobs "clearly requires one to stand" and "there are no seats anywhere on the industrial floor." Pl. Mem. at 22–23. Therefore, Ray argues that, inasmuch as the ALJ's hypothetical included the limitation that the individual "would need to be able to alternate between sitting and standing on an hourly basis," R. 47-48, "an obvious discrepancy" exists between the VE's testimony about the performance of such jobs and the DOT. Pl. Mem. at 24. Ray asserts that the ALJ erred in failing to address this alleged conflict.

As the Commissioner correctly notes, however, a district court exercising its statutory authority to review a disability benefits decision must do so based upon "the pleadings and the

33

transcript of the record" giving rise to the ALJ's "findings and decision," a certified copy of which record must be filed with the court. 42 U.S.C. § 405(g); *see Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972) (noting that district courts "are restricted to the administrative record in performing their limited function of determining whether the [Commissioner's] decision is supported by substantial evidence"). "[I]n determining whether the ALJ's decision is supported by substantial evidence, a district court cannot consider evidence which was not presented to the ALJ." *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996). Therefore, the Court will not consider the YouTube videos identified in Ray's brief.

This leaves the question whether an "apparent conflict" existed between the VE's testimony and the DOT that the ALJ should have identified. Relying on the fact that "light work" by definition "requires a good deal of walking and standing," 20 C.F.R. § 404.1567(b), and that the ALJ's hypothetical restricted the range of light work to that involving "alternate sitting and standing after one hour," R. 13, Ray alternatively argues that "common sense" and "common knowledge" indicate that a person requiring a sit/stand option would be unable or have difficulty performing the three jobs identified by the VE, each of which requires significant walking and standing. Pl. Reply Br., ECF No. 12 at 2–3.

The Court is not persuaded for the following reasons. First, a job involving light work need not always involves significant walking or standing, as Ray suggests. Instead, a job meets the definition of light work "when it requires a good deal of walking or standing, *or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.*" 20 C.F.R. § 404.1567(b) (emphasis added).

Second, the DOT's job descriptions for the three positions identified by the VE do not explicitly address whether the jobs must or may be performed in either a seated or standing

34

position. While it appears that each job has requirements that likely necessitate some standing or walking about (for example, ironing garments, packaging garments, and distributing and collecting mail), each job also specifies other requirements that apparently could be performed while seated (for example, operating a sewing machine, sorting and folding garments, and sorting, stamping, and examining mail). Rather than being actually or apparently at odds with the DOT's listing of occupational requirements, the sit/stand option incorporated by the ALJ appears to be consistent with them. Therefore, although Ray correctly notes that some light, unskilled jobs necessitating prolonged standing or walking are inconsistent with a sit/stand option, Pl. Reply Br. at 3, no apparent conflict exists here.

For this reason, this case differs from *Pearson*. There, the three jobs identified by the VE each required, according to the DOT, "*frequent* reaching," while the ALJ's hypothetical restricted the work to occasional "'overhead . . . reaching using the upper nondominant extremity." *Pearson*, 810 F.3d at 206, 210. Noting that the DOT defined reaching as "[e]xtending hand(s) and arm(s) in any direction," the Fourth Circuit found that an apparent conflict existed between the VE's jobs testimony and the DOT, which arguably contemplated frequent bilateral reaching. *Id.* at 210–11. Due to the absence of a similar apparent conflict here, the ALJ committed no error and need not have conducted further inquiry of the VE.

## VI. RECOMMENDATION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 8) be GRANTED in part and DENIED in part, the Commissioner's motion for summary judgment (ECF No. 10) be DENIED, and the decision of the Commissioner be VACATED AND REMANDED for further consideration.

## VII.  REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.  Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.  A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
April 27, 2017

36